**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **BROOKE MORRISON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:13CV389 JCH(LMB)** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Brooke Morrison for Disability Insurance Benefits under Title II of the

Social Security Act.  The cause was referred to the undersigned United States Magistrate Judge

for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b).  Plaintiff has filed a Brief in

Support of the Complaint.  (Document Number 12).  Defendant has filed a Brief in Support of the

Answer.  (Doc. No. 17).

**Procedural History**

On February 19, 2008, plaintiff filed her application for benefits, claiming that she became

unable to work due to her disabling condition on September 1, 1999.  (Tr. 83-86).  This claim

was denied initially, and following an administrative hearing, plaintiff's claim was denied in a

written opinion by an Administrative Law Judge (ALJ), dated January 29, 2010.  (Tr. 48-52, 5-

16).  On October 28, 2010, the Appeals Council denied plaintiff's request for review.  (Tr. 1-3).

On February 21, 2012, the United States District Court for the Eastern District of Missouri[1] reversed and remanded the case to the Commissioner. (Tr. 707-41). On December 27, 2012, after a supplemental hearing, an ALJ issued an unfavorable decision. (Tr. 652-67). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.    First ALJ Hearing

Plaintiff's first administrative hearing was held on October 27, 2009. (Tr. 19). Plaintiff was present and was represented by counsel. (Id.). Also present was witness Derek J. Morrison. (Id.).

Plaintiff's attorney stated that she would like to submit a witness statement and school records to demonstrate plaintiff's record of absenteeism. (Tr. 20). The ALJ indicated that he would hold the record open for thirty days to allow plaintiff an opportunity to submit additional evidence. (Id.).

Plaintiff's attorney then examined plaintiff, who testified that she was thirty-three years of age. (Id.). Plaintiff stated that she completed ninth grade and then left school because she was sick too often to earn credits. (Tr. 21). Plaintiff testified that she typically missed approximately a week-and-a-half of school every month due to chronic bacterial infections. (Id.). Plaintiff stated that she suffered from kidney infections, mouth infections, abscessed teeth, sinus infections, blood infections, and fungal infections. (Id.). Plaintiff testified that when she was in school, her doctors

---

[1]United States District Judge Jean C. Hamilton, adopting the Report and Recommendation of the undersigned United States Magistrate Judge.

did not know why she experienced these chronic infections and that they treated her with antibiotics.  (Id.).

Plaintiff stated that she last worked in September of 1999 as a veterinarian assistant.  (Id.).  Plaintiff testified that she held animals while the veterinarian gave injections, swept floors, and cleaned out cages at this position.  (Tr. 22).  Plaintiff stated that she worked full-time when her health allowed it and her hours were reduced to part-time when she was sick.  (Id.).

Plaintiff testified that she was hospitalized for eight to nine days at a time, after which she needed three to eight days to recover.  (Id.).  Plaintiff stated that her doctor occasionally wrote letters to her employer indicating that her hours should be reduced to part-time.  (Id.).  Plaintiff testified that she worked at this position for a year-and-a-half to two years.  (Id.).  Plaintiff stated that she was hospitalized about three times during this period.  (Id.).  Plaintiff testified that she missed six to nine days of work in the average month.  (Id.).  Plaintiff stated that she worked part-time about half of the time.  (Tr. 23).

Plaintiff testified that she stopped working at this position when her doctor ordered her to stop working and placed her on bed rest.  (Id.).  Plaintiff stated that when she stopped working she was pregnant and was experiencing problems with neutropenia[2] and chronic bacterial infections as well as pregnancy complications.  (Id.).  Plaintiff testified that on days she did not work, she remained in bed at home or she was in the hospital.  (Id.).

Plaintiff stated that after she left work and her daughter was born, her condition worsened.

---

[2]The presence of abnormally small numbers of neutrophils in the circulating blood. Neutrophils are the mature white blood cells in the granulocytic series, formed by myelopoietic tissue of the bone marrow and released into the circulating blood, where they normally represent 54 to 65 percent of the total number of leukocytes.  See Stedman's Medical Dictionary, 1317 (28th Ed. 2006).

(Id.).  Plaintiff testified that she experienced continuous infections.  (Id.).  Plaintiff stated that she received antibiotics prophylactically.  (Tr. 24).

Plaintiff testified that she started taking Neupogen[3] three to four days a week because she became resistant to several different types of antibiotics.  (Id.).  Plaintiff stated that she injects Neupogen into her legs.  (Id.).  Plaintiff testified that she first started taking Neupogen in 1995 when she experienced a life-threatening infection and almost died.  (Id.).  Plaintiff stated that her doctor believed that the Neupogen might cause her bone marrow to produce white blood cells.  (Id.).  Plaintiff testified that she was taking Neupogen in 1999 but did not take it unless it was necessary during her pregnancy due to the possible effects on the baby.  (Id.).  Plaintiff stated that shortly after her daughter was born, she began taking Neupogen at least twice a week.  (Tr. 25).  Plaintiff testified that she started taking Neupogen full-time beginning in September of 2001.  (Id.).

Plaintiff stated that the Neupogen causes side effects.  (Id.).  Plaintiff testified that three to four hours after she injects the medication, she starts getting a fever, chills, nausea, vomiting, body aches, bone pain, and tachycardia.  (Id.).  Plaintiff stated that these side effects last two to three hours, until she is able to hold down Tylenol.  (Id.).  Plaintiff testified that the bone pain, tachycardia and exhaustion persist another day or two.  (Id.).  Plaintiff stated that Neupogen is typically used to treat cancer patients after undergoing chemotherapy.  (Id.).  Plaintiff testified

---

[3]Neupogen is a human granulocyte colony-stimulating factor indicated for the treatment of cancer patients and patients with severe chronic neutropenia.  It is indicated for chronic administration to reduce the incidence and duration of sequelae of neutropenia (e.g., fever, infections, oropharyngeal ulcers) in symptomatic patients with congenital neutropenia, cyclic neutropenia, or idiopathic neutropenia.  See Physician's Desk Reference (PDR), 589-91 (63rd Ed. 2009).

that her doctors have told her that she has the immune system of a cancer patient. (Tr. 26).

Plaintiff stated that in 2001, when she started taking Neupogen all the time, she was experiencing dizziness and infections and her white blood cell count was extremely low. (Id.). Plaintiff testified that she was hospitalized and her doctors decided that her white blood cell count should not dip below 3,000. (Id.). Plaintiff stated that if she is healthy, she takes Neupogen three times a week and if she is ill, she takes it daily for five days at a time. (Tr. 27). Plaintiff testified that in 2001, she had quite a few infections and had to take Neupogen daily once or twice a month. (Id.).

Plaintiff stated that in 2001, she spent her days either lying on a heating pad or crying due to pain. (Id.). Plaintiff testified that her grandmother took care of her baby overnight two to four times a week. (Id.). Plaintiff stated that her mother spent the night at her house to take care of the baby about two times a week. (Tr. 28). Plaintiff testified that she did not engage in much activity the day after she took the Neupogen shot. (Id.). Plaintiff stated that she was able to perform light housework such as folding laundry and straightening up, if she did not take the shot the previous night. (Id.). Plaintiff testified that her energy level was low due to the Neupogen and the pain. (Id.). Plaintiff stated that she took two to three naps a day for thirty minutes to two hours. (Tr. 29).

Plaintiff testified that her condition was the same from January 2002 through June 2002. (Id.). Plaintiff stated that she was taking the shots three times a week at that time as well. (Id.).

Plaintiff testified that she has also had flare-ups of Crohn's disease.[4] (Id.). Plaintiff stated

---

[4]A subacute chronic inflammation of the intestine of unknown cause, characterized by patchy deep ulcers that may cause fistulae, and by narrowing and thickening of the bowel. Symptoms include fever, diarrhea, cramping, abdominal pain, and weight loss. See Stedman's at

that she was hospitalized with flare-ups before 1999. (Id.).

Plaintiff testified that she started seeing a new doctor six months prior to the hearing, who is trying to improve her quality of life by reducing her Neupogen shots. (Tr. 30). Plaintiff stated that her doctor tried reducing her shots to once a week but this dosage was not effective and she currently receives two shots a week. (Id.). Plaintiff testified that her blood count is still low with two shots a week. (Id.).

Plaintiff stated that her functioning has changed in the last couple of years. (Tr. 31). Plaintiff testified that she is experiencing infarctions in her spleen due to the medication. (Id.). Plaintiff stated that these infarctions cause abdominal pain. (Id.). Plaintiff testified that she has ulnar neuropathy[5] nerve damage in her hands. (Id.). Plaintiff stated that the medication has also caused osteoarthritis[6] in her spine due to chronic use. (Id.). Plaintiff testified that not many people have taken Neupogen as long as she has and that the consequences of such long-term use were not known. (Id.).

Plaintiff stated that she discovered that her spleen was enlarged in 2004 after undergoing a CT scan for chest pain. (Id.). Plaintiff testified that her abdominal pain does not respond to pain medication. (Tr. 32). Plaintiff stated that her abdominal pain is a throbbing toothache-type pain.

---

646.

[5]Ulnar neuropathy occurs when the nerve that passes close to the surface of the skin at the elbow is damaged. It may result in weakness, numbness or pain in the elbow, hand, wrist, or fingers. See WebMD, http://www.webmd.com/brain/understanding-peripheral-neuropathy (last visited January 15, 2014).

[6]Arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result. Stedman's at 1388.

(Id.).  Plaintiff testified that her pain only stops if she stops taking Neupogen for a few days.

(Id.).

Plaintiff stated that she was diagnosed with ulnar neuropathy in both hands in March of 2009.  (Id.).  Plaintiff testified that she experiences chronic numbness in the fingers of her left hand.  (Id.).  Plaintiff stated that she has difficulty grasping things such as pens, razors, dishes, and toilet paper.  (Tr. 33).  Plaintiff testified that she is left-hand dominant.  (Id.).  Plaintiff stated that she also has numbness in the fingers of her right hand.  (Id.).  Plaintiff testified that her doctors do not know the cause of her numbness.  (Id.).

Plaintiff stated that she started having problems with osteoarthritis in her lower back in 2002 or 2003.  (Tr. 34).  Plaintiff testified that she has stiffness if she lies on either her back or her side too long, and wakes up with excruciating pain.  (Id.).  Plaintiff stated that she experiences a constant dull pain in her back.  (Id.).

Plaintiff testified that before 2002, she was taking Neupogen and experienced bone pain in her back, hips, legs, and shins.  (Id.).  Plaintiff stated that she experienced excruciating pain in her hips, legs, and shins, which made it difficult to stand.  (Tr. 35).  Plaintiff testified that she was unable to stand in one position for more than a couple seconds.  (Id.).  Plaintiff stated that she also had difficulty sitting in one position for any length of time.  (Id.).  Plaintiff testified that she was only able to sit in one position for about ten minutes without squirming and getting up to stretch.  (Id.).

Plaintiff stated that prior to June 30, 2002, she was upset by the adjustments she had to make to her life due to her physical problems.  (Id.).  Plaintiff testified that she cried a lot during this period.  (Id.).

Plaintiff's attorney indicated that he would submit school records, a lay witness statement from plaintiff's mother, and a letter from plaintiff's doctor. (Tr. 36).

Plaintiff's attorney then examined plaintiff's husband, Derek J. Morrison, who testified that he had been married to plaintiff since September of 1999. (Tr. 37). Mr. Morrison stated that when he married plaintiff, she had severe chronic neutropenia and Crohn's disease. (Id.). Mr. Morrison testified that plaintiff had good days and bad days at this time. (Id.). Mr. Morrison stated that he met plaintiff a year before they married, and that she was doing pretty well from what he could tell at that time. (Tr. 38).

Mr. Morrison testified that when plaintiff was working as a veterinarian's assistant, she missed worked occasionally due to her condition. (Id.). Mr. Morrison stated that plaintiff often called in to work the day after she received her shot due to the complications of the medication. (Id.). Mr. Morrison testified that plaintiff eventually stopped working when her condition worsened. (Id.). Mr. Morrison stated that plaintiff suffered from increased fatigue and pain when she stopped working. (Tr. 39). Mr. Morrison testified that it became increasingly difficult for plaintiff to recover from her shots. (Id.).

Mr. Morrison stated that he noticed that plaintiff's energy levels were very low when she stopped working. (Id.). Mr. Morrison testified that plaintiff was unable to function as she normally did. (Id.). He stated that plaintiff was only able to perform light household chores such as picking up and wiping off tables. (Id.).

Mr. Morrison testified that about two to four hours after plaintiff received her shot, she became violently ill. (Id.). Mr. Morrison stated that plaintiff would experience a fever, chills, uncontrollable shaking, nausea, and vomiting. (Id.). Mr. Morrison testified that after these

symptoms subsided, plaintiff started experiencing pain, which lasted between twenty-four and thirty-six hours. (Id.). Mr. Morrison stated that during the period when plaintiff experienced pain, he observed that she was sluggish, cried a lot, constantly tried to hold her legs and back, and used heating pads for her legs and back. (Tr. 40). Mr. Morrison testified that plaintiff has been using the heating pads after every shot from 1999 through the date of the hearing. (Id.).

Mr. Morrison testified that, on a good day during the period of 1999 to 2002, plaintiff was able to work a full day, cook dinner, and clean. (Tr. 41). Mr. Morrison stated that on a bad day, plaintiff was unable to get out of bed other than to use the bathroom. (Id.). Mr. Morrison testified that, after plaintiff stopped working, she had two to four bad days in an average week. (Id.). Mr. Morrison stated that after plaintiff's daughter was born in 2000, plaintiff had four to six bad days a week. (Id.). Mr. Morrison testified that he worked during this time. (Tr. 42). Mr. Morrison stated that plaintiff's mother came over to help plaintiff when he worked. (Id.). Mr. Morrison testified that he occasionally had to leave work to take care of plaintiff and his daughter. (Id.).

Mr. Morrison stated that from 2000 to 2002, plaintiff performed "light pick up work." (Id.). Mr. Morrison testified that if plaintiff was having a rare exceptional day, she vacuumed for about twenty minutes and did some light dusting in one room. (Id.).

Mr. Morrison stated that plaintiff saw doctors constantly during this period. (Id.). Mr. Morrison testified that plaintiff saw an oncologist, primary care physician, and ENT regularly. (Id.). Mr. Morrison stated that plaintiff's oncologist at that time was Dr. Mark Stutz. (Id.).

Mr. Morrison testified that after June of 2002, plaintiff's condition progressively worsened. (Tr. 43). Mr. Morrison stated that plaintiff started receiving shots more frequently,

from one time a week to two or three times a week. (Id.). Mr. Morrison testified that plaintiff was unable to engage in any activity and it was difficult for her to simply get up and use the restroom. (Id.). Mr. Morrison stated that plaintiff's doctors have indicated that the amount of medication she has received has increased her symptoms. (Id.).

Mr. Morrison testified that plaintiff's Crohn's disease has been in remission for a while but she has some recurring symptoms. (Tr. 44). Mr. Morrison stated that plaintiff experiences chronic pains in her sides, which causes her to double over in pain. (Id.). Mr. Morrison testified that these symptoms were not happening as frequently prior to June 30, 2002. (Id.). Mr. Morrison stated that he recalls plaintiff having these symptoms three or four times prior to June 30, 2002. (Id.).

## B.    Second Administrative Hearing

Plaintiff's second administrative hearing was held on December 17, 2012. (Tr. 670). Plaintiff was present and was represented by counsel. (Id.). Also present was vocational expert Robin Cook. (Id.).

The ALJ noted that the relevant time period was September 1, 1999 through June 30, 2002. (Id.). The ALJ indicated that he would not consider any evidence outside this period. (Id.).

The ALJ examined plaintiff, who testified that she was currently living in a home with her husband and her twelve-year-old daughter. (Tr. 672). Plaintiff stated that her husband was working full-time and that he worked full-time during the relevant period. (Id.).

Plaintiff testified that she received a GED and has training as a veterinarian assistant and dietary aide. (Tr. 672). Plaintiff stated that she worked part-time as a dietary aide when she was

sixteen.  (Id.).  Plaintiff testified that she has also worked in a restaurant doing "salad prep."  (Id.).

Plaintiff stated that she has never supervised other employees at any of her positions.  (Tr. 673).

Plaintiff's attorney examined plaintiff, who testified that during the period of June 1999

through September 1999 she was on bed rest.  (Tr. 674).  Plaintiff stated that she was pregnant

during this period and she had pregnancy-related complications such as a low-lying placenta,

diabetes, and bleeding.  (Id.).  Plaintiff testified that she also had problems related to her

neutropenia, including frequent infections and mouth sores.  (Tr. 675).  Plaintiff stated that she

experienced these problems consistently during this period.  (Id.).

Plaintiff testified that she received Neupogen injections a couple times a week for the

neutropenia during this period.  (Id.).  Plaintiff stated that the Neupogen injections were effective

at increasing her white blood count.  (Tr. 676).  Plaintiff testified that she experienced side effects

three to four hours after receiving a Neupogen injection, including fever, shaking, chills, vomiting,

muscle , tachycardia, and "excruciating bone pain from the waist down."  (Id.).  Plaintiff stated

that the bone pain affected her ability to stand.  (Tr. 677).  Plaintiff testified that the pain also

affected her ability to concentrate.  (Id.).

Plaintiff stated that her child was delivered on May 17, 2000.  (Id.).  Plaintiff testified

she tried to avoid taking Neupogen during her pregnancy due to the unknown effects on a fetus.

(Tr. 678).  Plaintiff stated that she resumed the Neupogen two days after being discharged from

the hospital because her stitches became infected.  (Id.).  Plaintiff testified that she started taking

Neupogen prophylactically to increase her white blood count and prevent infections after the birth

of her child.  (Id.).  Plaintiff stated that, at first she received one injection a week, but it was

increased to three to four times a week.  (Id.).  Plaintiff testified that this course of treatment

continued until approximately six months prior to the hearing. (Id.). Plaintiff stated that, in June 2002, she typically received three injections a week. (Tr. 679). Plaintiff testified that Dr. Mark Stutts was her treating doctor during the relevant period. (Id.).

Plaintiff stated that the side effects of the Neupogen injections would begin three to four hours after she received the injection and would continue the day after the injection. (Tr. 680). Plaintiff testified that, on the days she took Neupogen, she would wake up in the morning to feed her daughter and then lie down with a heating pad. (Tr. 681). Plaintiff stated that, during the relevant period, her grandmother kept her daughter overnight two to four times a week. (Id.). Plaintiff testified that her mother came to stay at plaintiff's home to help with the baby approximately two days a week. (Id.).

Plaintiff stated that she was able to do very little household chores on the days she took Neupogen. (Tr. 682). For example, plaintiff testified that she was able to sit on the couch and fold laundry or clear the table. (Id.).

Plaintiff testified that she was prescribed Oxycodone for her pain during the relevant period. (Id.). Plaintiff stated that the Oxycodone caused her to feel "a little groggy," at first. (Id.).

Plaintiff testified that she also has Crohn's disease and that she experienced a couple flare-ups during the relevant period. (Id.). Plaintiff stated that she was not hospitalized during the relevant period for Crohn's disease flare-ups. (Id.). The ALJ noted that the medical records do not note any Crohn's disease flare-ups. (Id.).

Plaintiff testified that she was able to breast-feed her daughter during the relevant period. (Tr. 683).

The ALJ examined vocational expert Robin Cook, who testified that plaintiff's past work was classified as: a combination of cook helper and kitchen helper, which is unskilled and medium; dietary aide, which is unskilled and light; telemarketer, which is semiskilled and sedentary; and veterinarian assistant, which is skilled and light. (Tr. 685-86).

The ALJ asked Ms. Cook to assume a hypothetical claimant with plaintiff's background and the following limitations: light work; should avoid fumes, odors, dust and gases; avoid ropes, ladders, and scaffolding; and limited to unskilled work due to side effects of her pain medication. (Id.). Ms. Cook testified that the claimant could perform plaintiff's past combination position of cook helper and kitchen helper as plaintiff performed it but not according to the Dictionary of Occupational Titles ("DOT"); and plaintiff's dietary aide position as plaintiff performed it but not according to the DOT. (Tr. 686-87). Ms. Cook testified that the individual could also perform other light work, such as office helper (83,250 positions nationally, 1,810 in Missouri); recreation aide (253,110 positions nationally, 4,460 positions in Missouri); and tanning salon attendant (18,410 positions nationally; 280 in Missouri). (Tr. 687).

Plaintiff's attorney examined Ms. Cook, who testified that a limitation of missing work two to three times a month due to health conditions would preclude all competitive employment. (Tr. 688). Ms. Cook stated that a typical employer will tolerate only one absence a month. (Id.). Ms. Cook testified that repeated episodes of missing multiple days of work due to illness could also be problematic. (Tr. 689). Ms. Cook stated that an employer would not tolerate an extra rest break on a regular basis. (Tr. 690).

**C.     Relevant Medical Records**[7]

The record reveals that plaintiff was hospitalized at Missouri Baptist Medical Center from November 17, 1998, through November 21, 1998, for chronic neutropenia[8] and acute epiglottitis.[9] (Tr. 325-32).  Mark Stutz, M.D. noted that plaintiff had chronic benign neutropenia dating back to at least 1987, and that she chronically had less than 500 granulocytes,[10] although she had done quite well overall with only one or two episodes of infection yearly and less frequent problems with hospitalization.  (Tr. 325).  Dr. Stutz indicated that plaintiff began to experience problems with fever, sinus drainage, and some sore throat.  (Id.).  Plaintiff was treated with intravenous antibiotic therapy, and her condition improved, with her white count rising dramatically to a high of 40,000 with 93 percent granulocytes on the day of discharge.  (Id.).

Plaintiff was hospitalized from February 27, 1999, through March 3, 1999, with chronic

---

[7]The court's summary of the medical evidence is taken from the undersigned's December 27, 2011 Report and Recommendation.  Because plaintiff's insured status under Title II expired on June 30, 2002, the relevant time period for consideration is from September 1, 1999 through June 30, 2002.  See 20 C.F.R. § 404.130.  Medical evidence dated after the relevant period is relevant only in "helping to elucidate a medical condition during the time for which benefits might be rewarded."  Pyland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998).

[8]Severe chronic neutropenia is a rare blood disorder characterized by abnormally low levels of neutrophils in the body.  Neutrophils play an essential role in fighting bacterial infections by surrounding and destroying invading bacteria.  Symptoms associated with severe chronic neutropenia include recurring fevers, mouth sores, and inflammation of the tissues that surround and support the teeth.  Affected individuals may be more susceptible to recurring infections that, in some cases, may result in life-threatening complications.  See WebMD, http://www.webmd.com/brain/neutropenia-severe-chronic (last visited January 15, 2014).

[9]Inflammation of the epiglottis, a leaf-shaped plate of elastic fibrocartilage covered with mucous membrane at the root of the tongue, which may cause respiratory obstruction.  See Stedman's at 655.

[10]A mature granular leukocyte; includes neutrophilic, acidophilic, and basophilic types of leukocytes; respectively, neutrophils, eosinophils, and basophils.  Stedman's at 831.

idiopathic neutropenia, and acute urinary tract infection secondary to sinusitis[11] and pharyngitis.[12]  (Tr. 300-15).  Plaintiff received IV antibiotic therapy and improved.  (Tr. 301).  Plaintiff was discharged on Neupogen two times a week.

In a letter to plaintiff's obstetrician dated October 13, 2000, Dr. Stutz stated that plaintiff had been having a lot of problems with sinus congestion, headache, and some low-grade fevers along with some yellow nasal discharge.  (Tr. 184).  Dr. Stutz noted that plaintiff has chronic neutropenia and a history of chronic sinusitis.  (Id.).  He indicated that he treated plaintiff with antibiotics and some Neupogen for a couple of weeks.  (Id.).

On February 28, 2001, Dr. Stutz diagnosed plaintiff with acute maxillary sinusitis[13] in the face of her chronic neutropenia.  (Tr. 551).  Dr. Stutz prescribed Neupogen daily for three days and then weekly for about four weeks.  (Id.).

Plaintiff was hospitalized from September 19, 2001, through September 21, 2001, with chronic congenital neutropenia and fever, probably secondary to sinusitis.  (Tr. 254).  Plaintiff was treated with intravenous antibiotic therapy.  (Tr. 254).

Plaintiff saw Dr. Stutz on October 30, 2001, for follow-up regarding acute sinusitis.  (Tr. 458).  Plaintiff reported that she was feeling better after taking Neupogen daily for a five-day period.  (Id.).  Plaintiff complained of feeling exhausted all the time, although Dr. Stutz stated that he suspected "a lot of this is because of her two small children."  (Id.).  Plaintiff complained of occasional dizzy spells

---

[11]Inflammation of the mucous membrane of any sinus.  Stedman's at 1777.

[12]Inflammation of the mucous membrane and underlying parts of the pharynx.  Stedman's at 1473.

[13]Sinusitis affecting the maxillary sinuses, the sinuses of the upper jaw.  See Stedman's at 1163.

when her heart races.  (Id.).  Plaintiff reported no problems taking the Neupogen.  (Id.).  Dr. Stutz's impression was acute sinusitis.  (Id.).  He noted that this was the third recurrent episode plaintiff had had in fairly quick succession.  (Id.).  Dr. Stutz prescribed Neupogen twice weekly for the next four weeks and recommended that plaintiff see Dr. Rosenblum regarding a sinus procedure.  (Id.).

Plaintiff saw Barry Rosenblum, M.D. on November 7, 2001, at which time Dr. Rosemblum stated that plaintiff's congenital neutropenia has led to "life threatening sinusitis and long hospitalizations."  (Tr. 358).  Dr. Rosenblum recommended sinus surgery to prevent recurrences. (Id.).  He noted that neutropenia is not curable but is manageable.  (Id.).

In a letter to Dr. Stutz dated November 8, 2001, Dr. Rosemblum stated that plaintiff has had recurrent life threatening sinusitis in the setting of neutropenia.  (Tr. 391).  Dr. Rosemblum stated that anything that can be done to prevent the development of sinusitis or to facilitate its resolution would be of great value to plaintiff.  (Id.).  Dr. Rosemblum stated that a bilateral antrostomy[14] and limited anterior ethmoidectomy[15] would be of great value to plaintiff and that plaintiff agreed with this strategy.  (Id.).

In a note dated November 30, 2001, Dr. Rosenblum's office noted that plaintiff had called in complaining of facial pressure and congestion and that antibiotics were prescribed.  (Tr. 357).  It was also noted that surgery was scheduled for December 4, 2001.  (Id.).

On December 4, 2001, plaintiff underwent bilateral septoplasty,[16] limited ethmoidectomy, and

---

[14]Formation of a permanent opening into any antrum, or cavity.  See Stedman's at 113.

[15]Removal of all or part of the mucosal lining and bony partitions between the ethmoid sinuses.  Stedman's at 674.

[16]Operation to correct defects or deformities of the nasal septum, often by alteration or partial removal of skeletal structures.  Stedman's at 1750.

bilateral endoscopic antrostomy. (Tr. 242). Dr. Rosenblum listed her diagnosis as recurrent sinusitis, nasal obstruction, and chronic neutropenia. (Tr. 242).

Plaintiff saw Dr. Stutz on March 6, 2002, for follow-up after reporting sinus symptoms of congestion, sore throat, and changing color of her nasal drainage six days prior on February 28, 2002. (Tr. 554). Plaintiff had taken Neupogen daily for a period of three days and then every other day. (Id.). Plaintiff reported feeling better since the previous week. (Id.). Dr. Stutz's impression was chronic neutropenia. (Id.). He indicated that plaintiff reported low back and hip discomfort after the first dose of Neupogen but indicated that subsequent doses were not as bad. (Id.). Dr. Stutz prescribed Oxycodone[17] for plaintiff's low back and hip pain. (Id.). Dr. Stutz noted that plaintiff reported that her episodes of infection appeared to follow situational stress and anxiety in her life. (Id.). Dr. Stutz recommended that plaintiff undergo a bone marrow biopsy in ten weeks to get an accurate baseline bone marrow due to her long-term use of Neupogen. (Id.).

Plaintiff saw Dr. Stutz on May 7, 2002, at which time she reported that she was planning a ten-day vacation to Florida in a week and inquired whether she could to something to avoid getting sick. (Tr. 457). Plaintiff reported no overt symptoms of sinusitis at that time. (Id.). Plaintiff reported intermittent problems with tachycardia but indicated that this was clearly related to caffeine. (Id.). Dr. Stutz's impression was chronic neutropenia with history of recurrent sinusitis. (Id.). He started plaintiff on Neupogen therapy two times a week due to plaintiff's upcoming out-of-town trip. (Id.). Dr. Stutz also prescribed Oxycodone for the back pain associated with the use of Neupogen. (Id.).

On January 3, 2003, Dr. Rosenblum diagnosed plaintiff with chronic neutropenia and chronic

_____

[17]Oxycodone is an opioid analgesic indicated for the management of moderate to severe pain when a continuous, around-the-clock analgesic is needed for an extended period of time. See PDR at 2589-90.

tonsillitis.[18] (Tr. 354). Dr. Rosenblum indicated that plaintiff had been on Neupogen the past three months and continued to suffer recurrent tonsillitis in her tonsil remnants and chronic right maxillary sinusitis. (Tr. 389). Dr. Stutz indicated that plaintiff was scheduled to undergo completion tonsillectomy, and right antrostomy. (Id.).

Plaintiff underwent a CT scan of the sinuses on April 24, 2003, which revealed interval development of inflammatory disease in the dependent portion of the right maxillary sinus. (Tr. 241).

On June 5, 2003, plaintiff underwent endoscopic right antrostomy. (Tr. 235). Dr. Rosenblum listed plaintiff's diagnosis as chronic right maxillary sinusitis. (Id.).

Plaintiff saw Dr. Stutz on December 14, 2004, at which time plaintiff reported feeling much better. (Tr. 446). Plaintiff was using Neupogen two to three times and week and reported that she had fewer problems with chills and muscle aches when she uses it more often. (Id.). Dr. Stutz noted that plaintiff's sinuses were doing quite well. (Id.). Plaintiff reported having much less discomfort in her left upper quadrant although she complained of some vague abdominal pain. (Id.). Dr. Stutz stated that plaintiff was doing much better the past few months since being on a more regular dose of Neupogen. (Id.). He indicated that if plaintiff could stop smoking, this would make a huge difference in her condition. (Id.).

In a letter dated February 5, 2008, Dr. Stutz stated that he was treating plaintiff for chronic neutropenia, which dated back to her childhood. (Tr. 109). Dr. Stutz stated that plaintiff was being maintained on intermittent doses of granulocyte colony stimulating factor in order to maintain her neutrophil count above 1000. (Id.). Dr. Stutz stated that even with this treatment, plaintiff has frequent problems with sinusitis and requires frequent courses of antibiotic therapy. (Id.). Dr. Stutz

---

[18]Inflammation of a tonsil. Stedman's at 1999.

indicated that plaintiff had undergone sinus surgery in the past. (Id.). Dr. Stutz stated that, because of the chronic granulocyte colony stimulating factor administration and marrow stimulation, plaintiff has chronic bone pain that is a known side effect of that medication. (Id.). He noted that plaintiff uses Oxycodone on an as needed basis to control her chronic bone pain. (Id.).

On April 23, 2008, Jeffrey L. Wheeler, M.D., Regional Medical Consultant, reviewed plaintiff's claim file. (Tr. 596-98). Dr. Wheeler stated that the December 2004 treatment notes of Dr. Stutz indicate that the side effects of Neupogen were tolerable and that plaintiff's smoking was making the clinical picture worse. (Tr. 598). Dr. Wheeler noted that plaintiff was taking pain medication only on an as needed basis. (Id.). Dr. Wheeler stated that nothing in the treating source notes reflect the great allegations of impairments from symptoms made in plaintiff's activities of daily living report. (Id.). Dr. Wheeler noted that plaintiff was taking Neupogen episodically at her date last insured and thus did not have consistent side effects from it. (Id.). Dr. Wheeler stated that, in the five-month period preceding plaintiff's date last insured, she did not have the frequency or severity of systemic bacterial infections required by the listing. (Id.). Dr. Wheeler noted that plaintiff was treated once by phone in that interval. (Id.). Dr. Wheeler stated that there is no evidence of severe residual functional capacity restrictions at plaintiff's date last insured but there was insufficient evidence in the record to determine plaintiff's residual functional capacity for the relevant period. (Id.).

Plaintiff saw Dr. Stutz on May 14, 2008, at which time she was on antibiotics for bronchitis.[19] (Tr. 639). Dr. Stutz stated that plaintiff had resumed smoking and that he advised her that she was never going to get past these recurrent upper respiratory infections until she completely quit smoking for the long-term. (Id.).

---

[19]Inflammation of the mucous membrane of the bronchi. Stedman's at 270.

On August 19, 2008, Dr. Stutz stated that plaintiff has been maintained for the past several years with annual doses of Neupogen to maintain her neutrophil count in a range well over 1000 in order to prevent recurrent sinus infections. (Tr. 637). Dr. Stutz indicated that plaintiff was receiving Neupogen twice a week at that time. (Id.). He stated that plaintiff suffers from bone pain related to the Neupogen but this is manageable with Oxycodone. (Id.). Dr. Stutz noted that on days when plaintiff is off the Neupogen, she manages pretty well and is able to perform her daily activities. (Id.). Plaintiff had recently stopped smoking. (Id.).

Plaintiff saw Dr. Stutz on October 21, 2008, at which time he stated that plaintiff had remained without evidence of infection since he last saw her. (Tr. 634). He noted that he would be leaving St. Louis at the end of the month and that plaintiff would see Dr. Rachel Borson regarding her chronic neutropenia. (Tr. 635).

Plaintiff saw Dr. Borson on November 21, 2008, at which time Dr. Borson noted that plaintiff was "trying to go on disability because of the side effects from the [Neupogen]." Dr. Borson stated that she was concerned about long-term use of Neupogen and indicated that she would try to cut back on the dose and intensity of treatment and consider tapering off. (Id.). Dr. Borson stated that plaintiff appeared "okay with this idea, at least on the surface. This would certainly put a damper on her desire to get disability though, and I am not sure that this is going to in fact be disappointing to her. We will see what she does with the plan to taper and get her off of it, as time goes by." (Id.).

Plaintiff saw Dr. Borson on February 20, 2009, at which time Dr. Borson noted that plaintiff had not had any serious infections and her white count was "amazingly high" at 18,600. (Tr. 630). Dr. Borson cut plaintiff down to twice weekly injections and indicated that she would be tapered to once weekly injections, and then the Neupogen would be stopped. (Id.). Dr. Borson reiterated that

she did not believe plaintiff should be on Neupogen long-term.  (Id.).

Plaintiff saw Dr. Borson on May 22, 2009, at which time Dr. Borson indicated that she had to increase plaintiff's Neupogen injections from once a week to twice a week due to a recent upper respiratory infection.  (Tr. 628).  Dr. Borson's impression was chronic neutropenia, with stability and no problems since decreasing the frequency of injections.  (Id.).  Dr. Borson stated that plaintiff actually feels better on less frequent injections.  (Id.).  Plaintiff's neutrophil count was 500, which Dr. Borson described as adequate.  (Id.).  Dr. Borson continued plaintiff's regimen and instructed her to follow-up every three months.  (Id.).

## D.    Other Evidence

In a letter dated October 26, 2009, Alvin W. Kreher, D.V.M. stated that plaintiff worked for him in 1999 and was absent due to illness for a few hours to a day or two on six different occasions during the last six months of her employment.  (Tr. 95).  Dr. Kreher stated that no reprimands were given for chronic absenteeism due to illness, hospitalizations, or doctor visits because he knew plaintiff had some chronic health problems.  (Id.).  Dr. Kreher indicated that plaintiff had to drop down to part-time status several times because of her health.  (Id.).  He stated that plaintiff was replaced in September of 1999, when her doctor ordered her not to work.  (Id.).

On November 4, 2009, Marilyn Atnip, plaintiff's maternal grandmother, authored a letter on plaintiff's behalf.  (Tr. 151).  Ms. Atnip stated that plaintiff's neutropenia worsened shortly after she gave birth do her daughter.  (Id.).  Ms. Atnip stated that she helped plaintiff with housework and cared for her baby when plaintiff was ill due to the side effects of Neupogen.  (Id.).  Ms. Atnip indicated that she cared for plaintiff's baby overnight three to four nights a week consistently from 2000 through 2003.  (Id.).

On November 5, 2009, plaintiff's mother, Carolyn S. Lehnbeuter, authored a letter on plaintiff's behalf. (Tr. 152-53). Ms. Lehnbeuter stated that plaintiff started getting repeated infections starting at age two. (Tr. 152). Ms. Lehnbeuter stated that plaintiff's condition worsened in high school and that she was also diagnosed with Crohn's disease during this time. (Id.). Ms. Lehnbeuter indicated that plaintiff was diagnosed with chronic severe idiopathic neutropenia in 1995, after she almost died from a sinus infection. (Tr. 153). Ms. Lehnbeuter stated that plaintiff was hired at General Motors in 1996, but was unable to complete her ninety day probationary period due to her illness. (Id.). Ms. Lehnbeuter stated that plaintiff's chronic illness has affected every job she has had. (Id.).

## The ALJ's Determination

The ALJ made the following findings:

1.    The claimant last met the insured status requirements of the Social Security Act on June 30, 2002.

2.    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of September 1, 1999 through her date last insured of June 30, 2002 (20 CFR 404.1571 *et seq.*).

3.    Through the date last insured, the claimant had the following severe impairments: neutropenia and chronic sinusitis (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant must avoid climbing ladders, ropes, or scaffolds and working in environments with exposure to fumes, odors, dusts, and gases. She is limited to unskilled work due to side effects of

medications.

6.      Through the date last insured, the claimant was capable of performing past relevant work as a cook's helper (DOT 317.687-010), kitchen helper (DOT 318.687-010) and dietary aide (DOT 319.677-014). This work did not require the performance of work related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.      The claimant was not under a disability, as defined in the Social Security Act, at any time from September 1, 1999, the alleged onset date, through June 30, 2002, the date last insured (20 CFR 404.1520(f)).

(Tr. 657-61).

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits protectively filed on January 25, 2008, the claimant was not disabled under sections 216(I) and 223(d) of the Social Security Act through June 30, 2002, the last date insured.

(Tr. 661).

## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the

Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

**B.     The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied.  See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c)), 416.920 (c)).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

## C.    Plaintiff's Claims

Plaintiff argues that the ALJ erred in determining plaintiff's RFC. Plaintiff also argues that the ALJ failed to properly consider the dosage, effectiveness, and side effects of plaintiff's prescribed medications. The undersigned will discuss plaintiff's claims in turn.

The ALJ made the following determination with regard to plaintiff's RFC:

After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant must avoid climbing ladders, ropes, or scaffolds and working in environments with exposure to fumes, odors, dusts, and gases. She is limited to unskilled work due to side effects of medications.

(Tr. 658).

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer, 245 F.3d at 704.

Plaintiff argues that, in violation of this court's order, the ALJ failed to further develop the medical record. Plaintiff points to the December 27, 2011 Report and Recommendation, in which the undersigned recommended that the matter be reversed and remanded to the ALJ "in order for the ALJ to order additional medical information addressing plaintiff's ability to function in the workplace during the relevant period, formulate a new residual functional capacity for plaintiff based on the medical evidence in the record, and adduce the testimony of a vocational expert to determine how plaintiff's non-exertional impairments restrict her ability to perform jobs in the national economy."

(Tr. 740).

The ALJ acknowledged this court's directive to fully develop the record and obtain necessary medical evidence addressing plaintiff's ability to function in the workplace during the relevant period. (Tr. 655). The ALJ did not, however, obtain any additional medical evidence. Rather, the ALJ stated that treatment notes show that plaintiff's condition has been effectively managed with medications and that there is "no evidence showing that claimant has been restricted from engaging in the light type work activities described above in the residual functional capacity assessment." (Tr. 659). The ALJ continued, "[t]here is nothing in the record showing that she has symptoms so severe that she would be unable to sit, stand or walk up to six hours per day or to lift/carry objects weighing up to 20 pounds occasionally." (Id.).

The undersigned finds that the ALJ erred in failing to follow the directive of this court to further develop the medical record. The ALJ did not cite any medical evidence in support of her RFC determination. As was noted in the undersigned's previous Report and Recommendation, there is no opinion by any physician, treating or consulting, regarding plaintiff's ability to function in the workplace. The state agency medical consultant, Dr. Wheeler, indicated that he had insufficient information from which to make a residual functional capacity determination at that time. (Tr. 598). Thus, there is no medical evidence in the record indicating whether plaintiff is capable of performing a range of light work during the relevant period.

An ALJ has a duty to obtain medical evidence that addresses the claimant's ability to function in the workplace. See Hutsell, 259 F.3d at 711-712; Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000). Here, the ALJ's residual functional capacity assessment fails Lauer's test that the residual functional capacity be supported by *some* medical evidence. See Lauer, 245 F.3d at 703. Thus, the

ALJ failed to properly develop the record by not obtaining necessary medical evidence addressing plaintiff's ability to function in the workplace during the relevant period.

As discussed in the previous Report and Recommendation, the objective medical evidence reveals that plaintiff was diagnosed with five bacterial infections as a result of her chronic neutropenia during the relevant period. Plaintiff was hospitalized from September 19, 2001 through September 21, 2001, with chronic congenital neutropenia and fever secondary to sinusitis. (Tr. 254). On November 8, 2001, Dr. Rosemblum stated that plaintiff's neutropenia had led to "recurrent life threatening sinusitis." (Tr. 358). Plaintiff underwent sinus surgery on December 4, 2001 in an attempt to prevent recurrences of these life-threatening sinus infections. (Tr. 242). The fact that plaintiff underwent sinus surgery is inconsistent with the ALJ's finding that plaintiff's condition was effectively managed with medication.

In addition, the ALJ discredited plaintiff's complaints of bone pain resulting from the Neupogen, noting that they were not corroborated by the treatment notes. (Tr. 659). The record reveals that Dr. Stutz prescribed Oxycodone, a narcotic pain medication, for plaintiff's low back and hip pain caused by the Neupogen during the relevant period. (Tr. 554). The ALJ, therefore, failed to properly consider the side effects of the Neupogen in determining plaintiff's RFC.

The ALJ did obtain testimony from a vocational expert at the second administrative hearing. Significantly, the vocational expert testified that a typical employer will tolerate only one absence a month, and that repeated episodes of missing multiple days of work due to illness would also be problematic. (Tr. 689). The ALJ did not address the issue of the amount of time plaintiff would be expected to miss work during the relevant period due to her neutropenia and side effects from medications in determining her RFC.

Accordingly, the undersigned recommends that this matter be reversed and remanded to the ALJ in order for the ALJ to order additional medical information addressing plaintiff's ability to function in the workplace during the relevant period, formulate a new residual functional capacity for plaintiff based on the medical evidence in the record, and adduce the testimony of a vocational expert to determine how plaintiff's non-exertional impairments restrict her ability to perform jobs in the national economy.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that, pursuant to sentence four of 42 U.S.C. § 405 (g), the decision of the Commissioner be **reversed** and this case be **remanded** to the Commissioner for further proceedings consistent with this Report and Recommendation.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. <u>See</u> Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

Dated this 23rd day of January, 2014.

Lewis M. Blanton
_____
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE